# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6910 | **DATE** | 6/21/2001 |
| **CASE TITLE** | Castro, et al. vs. Chicago Housing Authority | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Motion of CHA for summary judgment [32-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUN 25 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | CO-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 JUN 22 AM 11: 42 | 6/21/2001 date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RONALD CASTRO et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 99 C 6910 |
| ) | |
| CHICAGO HOUSING AUTHORITY, ) | DOCKETED |
| ) | |
| Defendant. ) | JUN 2 5 2001 |

## MEMORANDUM OPINION AND ORDER

Plaintiffs allege in their complaint that the Chicago Housing Authority (the "CHA") violated the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.*, when the CHA terminated their employment as police officers without giving them 60 days notice. The CHA presently moves for summary judgment arguing that the WARN Act does not apply to government entities and, even if it did, the CHA is not considered an employer under the Act. The CHA also argues that if this court finds that the CHA comes within the WARN Act's purview, not all of the plaintiffs' terminations are actionable under the Act since only one of the work sites employed at least 50 terminated officers, that the CHA is entitled to a good faith defense requiring reduction in any damages, and that damages must be further reduced by certain wages paid and severance pay. For the reasons articulated below, the court denies the CHA's motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS[1]

The CHA is a municipal corporation organized under the Illinois Housing Authorities Act, 310 ILCS § 10/8. Plaintiffs are all former CHA police officers whose positions were eliminated when the CHA decided to cease operating a police department. Since 1970, the United States Department of Housing and Urban Development ("HUD") has been the CHA's primary source of funding, and the CHA could not function without continuing year-to-year

---

[1] The court notes that plaintiffs responded to certain CHA statements of undisputed fact supported solely by an affidavit with some variation of the following statement: "Inasmuch as there is no documentation in support of the Affidavit of [the affiant] Plaintiff[s] lack sufficient knowledge to properly respond." (*See, e.g.*, Pl.'s Resp. to Def.'s Fact Stat. ¶¶17, 18, 19, 20, 52 & 53.) Local Rule 56.1(b)(3)(B) states that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." To the extent that the submitted affidavit supports the facts set forth in the CHA's statement, this court will deem those facts admitted as plaintiffs failed to controvert these facts.

federal financial assistance.[2] HUD's funding is made through an Annual Contributions Contract ("ACC") entered into between HUD and the CHA, which sets forth the terms and conditions under which the CHA is allowed to spend its funds.[3] In June, 1995, HUD declared a breach of the ACC and, pursuant to the ACC's terms, assumed control of the CHA in the name of the Secretary of HUD.[4] HUD declared the CHA in breach after it determined that the CHA was spending an inordinate amount Comprehensive Grant Program funds on security and policy activities.[5] Therefore, although the CHA is normally administered by a board of commissioners

---

[2] For example, Greg Russ, the CHA's former interim chief of staff, chief of staff, deputy executive director of finance administration, chief of operations division, and chief of policy development, swore in his affidavit that in 1998, the CHA had an operating loss of $243,611,754. This loss, Russ stated, "was largely covered by nonoperating revenues, which consisted of $237,001,496 in intergovernmental transfers. This $237 million dollars in revenue consisted almost entirely of federal HUD funds. For example, in 1998, the CHA received HUD Low Rent subsidy payments of $190,552,861." (Russ Aff. ¶ 8.) The CHA had other sources of funding, and its total revenue can be broken down as follows:

   a.  Rental income from tenants [set by a federal regulatory formula and not based on market rental rates];
   b.  A Low Rent Operating subsidy received from . . . [HUD] which is derived by formula and received pursuant to the Annual Contribution Contract [("ACC")] . . . ;
   c.  A Comprehensive Grant Program, an annual grant derived by formula, spent an accounted for on the federal fiscal year (October to September), which is intended for capital improvements and repairs and also received pursuant to the ACC;
   d.  Various other grants including Section 8, Public Housing Drug Elimination Program Grants, and Community Oriented Policing Strategies Grants; and
   e.  Smaller grants and in-kind donations from various government and other public agencies.

(Def.'s Fact Stat. ¶ 16.) During 1998 and 1999, federal grants and subsidies made up over 80% of the CHA's income. Rent and other sources of income, such as local and state grants and subsidies accounted for less than 20% of the CHA's income.

[3] In addition to the HUD-restrictions on funding, funds derived from Section 8 subsidies, Public Housing Drug Elimination Program Grants, State of Illinois Summer Food Cooperative Recovery and other grants must be used for a specific purpose.

[4] In response to the CHA's fact statement that HUD took control of the CHA pursuant to the ACC, plaintiffs state that the CHA's commissioners voluntarily delegated and transferred all assets, liabilities and powers to HUD by resolution. Although the voluntariness of this resolution is debatable, the resolution in no way controverts the CHA's assertion that HUD assumed control.

[5] Apparently HUD was concerned that its funds were not being well-spent, as HUD's director of public housing wrote to the CHA's executive director:

3

appointed by the City of Chicago's Mayor and confirmed by the Chicago City Council, from June, 1995 to May, 1999, a HUD-appointed "Chairperson" administered the CHA. This Chairperson had the authority and was responsible for policy-making, approving contracts, and all other functions that were normally within the CHA's Board of Commissioners' authority. Moreover, HUD appointed an advisory executive committee that supplemented the CHA Board of Commissioners and took over Board operations created in accordance with Illinois statutes.

The CHA's executive director from October, 1995 to June, 1999, Joseph Shuldiner, testified at his deposition that the CHA had the authority to determine how best to manage certain property, including high-rises, police squad equipment, and janitorial supplies, as long as HUD standards were met. In addition, Shuldiner testified that the hiring and firing of CHA police officers was generally handled by the CHA as long as the CHA acted within funding constraints. In response to a question regarding whether he was the person who made decisions as to how to run day-to-day activities, Shuldiner replied, "Well, the Board or the chairperson gives general policy direction, but I implement it; and I have authority over such things as – within the parameters of an approved budget, how the budget is spent, hires, fires in many cases, what programs did or didn't do." (Shuldinger Dep. at 15.)

Matthew Brandon, CHA police department deputy chief prior to July 1996, CHA police department acting first deputy from July, 1996, through November, 1996, and CHA police

---

The U.S. Department of Housing and Urban Development (HUD) is concerned about and committed to providing a decent, safe and suitable living environment for all CHA residents and acknowledges that the Chicago Housing Authority (CHA) must spend funds to maintain a safe environment. However, the CHA spends an exorbitant amount of its CGP funds on security and related activities but the security being provided is very inefficient.

(Def. Ex. 1A, Pl.'s Ex. I.)

4

department acting chief of police from November, 1996 through December, 1996, attested that he while he was employed as acting chief of police, he "had independent authority to manage the CHA police department budget within the parameters allowed by HUD." (Brandon Aff. ¶ 5.) Brandon also stated that it was commonplace to transfer equipment such as radios and patrol cars between the CHA police department districts, that at any time an officer could be transferred between the CHA police department districts, that tactical officers reported to one central location but during their shifts they were assigned to cover all the CHA police department districts, and that on various occasions supervisory staff were responsible for overseeing more than one CHA police department district on a given shift.

In October, 1996, HUD issued a Corrective Action Order ("CAO"), which required the CHA to take the following two corrective measures: (1) to execute a Memorandum of Understanding ("MOU") with the Chicago Police Department that establishes a strategy and plan for law enforcement services in the CHA (this was done in September, 1997), and (2) to reduce spending on security and police by at least $25 million dollars during the two-year period of fiscal years 1997 and 1998. If the CHA failed to abide by the CAO, HUD could have withheld some or all of the CHA's General Grant Program funds.

From approximately 1989 to October, 1999, the CHA maintained a police department that consisted of sworn police officers who were represented by two unions.[6] The CHA also employed unsworn security officers who were represented by a different union. In order to

---

[6]The Captains, Lieutenants & Sergeants Coalition represented the CHA's supervisory police personnel, and the CHA entered into a collective bargaining agreement with this union effective January 1, 1996 to December 31, 1998. The Illinois Fraternal Order of Police represented the CHA's patrol officers and the CHA entered into a collective bargaining agreement with this union effective January 1, 1997 to December 31, 1999.

5

comply with the CAO, the CHA determined that it needed to reduce its police force and laid off 69 of its 394 police officers on September 11, 1998.[7] On September 21, 1999, after HUD had returned control of the CHA to the City of Chicago, the CHA formally notified the Captains, Lieutenants & Sergeants Coalition that it was contemplating terminating the operation of the CHA police department. On October 12, 1999, the CHA determined that it would cease operation of the CHA police department, and the CHA's then acting chief of police, Acting Chief Radney, distributed a memorandum to all police department personnel informing them of the CHA's decision. This decision resulted in the lay-off of 269 police officers and security personnel. The CHA also notified the three unions representing the police officers and security personnel on October 12, 1999 that their members would be separated from their employment effective October 29, 1999. At the time of the October, 1999 layoff, the police officers were generally stationed at one of five facilities, only one of which had assigned to it at least 50 officers.[8]

On October 18, 1999, Acting Chief Radney distributed a memorandum to all police department personnel informing them that all officers affected by the layoff were being placed on administrative leave beginning October 19, 1999. (A few police supervisors and security officers

---

[7]This layoff was the subject of another lawsuit brought against the CHA. On May 16, 2001, Judge Castillo granted summary judgment in the CHA's favor after determining that this reduction was not actionable under the WARN Act. *See Rowen v. Chicago Housing Authority*, No. 00 C 5557, 2001WL 521839 (N.D. Ill. May 16, 2001).

[8]The five sites were as follows:

(1) the department's headquarters on Cermak Road; (2) the North District station in the Cabrini Green Developments on the near north side; (3) the Central District station in the Cabrini Green Developments on the south side; (4) the South District state at Altgeld Gardens on the far south side; (5) the West District in the ABLA homes on the near west side.

(Def.'s Fact Stat. ¶ 44.)

were retained for administrative and transitional purposes for a short period of time after October 29.) The officers placed on administrative leave were paid through October 29, 1999 and provided with health and dental insurance benefits through December 31, 1999. The CHA paid 12 affected supervisory police personnel additional amounts of back wages, salary and severance pursuant to two agreements between the CHA and these officers' union. The CHA also paid each affected patrol officer additional amounts of back wages, salary and severance pursuant to two agreements between the CHA and these officers' union.

In the fall of 1999, Joseph Moriarty, the CHA's senior staff counsel, advised CHA officials on labor and employment issues relating to the decision to cease operation of the police department. After reviewing the WARN Act and its accompanying regulations promulgated by the United States Department of Labor (the "DOL"), Moriarty concluded that the CHA was not subject to the WARN Act because it was not an "employer" as defined by the DOL regulation located at 20 C.F.R. § 639.3(a)(1). Mr. Moriarty attested that he communicated this conclusion to CHA officials who were involved in making the decision to close the CHA police department. Moreover, on November 1, 1999, the CHA's chief executive officer wrote a letter to the Chicago Tribune's editor stating in pertinent part:

> Since June 1, 1999, my first day on the job as CEO of the CHA, the residents of CHA were demanding the same police services as those received by other Chicago communities. On October 12, Chairperson Sharon Gist Gilliam and I made the decision, based partly on their requests, to give CHA residents the ame Chicago Police Department services that the people in Lincoln Park, Hyde Park or Morgan Park are getting.
>
> The decision to terminate 270 sworn officers was not taken lightly, nor were the 10 years of dedicated service these officers gave CHA residents. But in the final analysis, a tough decision was made, many of the CHA officers called in "sick," creating a dangerous lapse in protection for CHA residents and a lack of supprt for

7

the CHA officers who did report for work.

At that point, another tough decision had to be made. CHA made the right decision to place all CHA officers on administrative leave, and with the cooperation of the Chicago Police Department, a special detail of Chicago police was assigned to patrol CHA communities. With this decision, instead of getting less service, in many cases, CHA residents got more police service.

(Pls.' Ex G.)

## DISCUSSION

**Does the WARN Act apply to government entities?**

The WARN Act, as pertinent here, requires all covered employers to issue 60 days notice before ordering a plant closing or mass layoff to each affected employee or the affected employee's representative and to the State or its designee "and the chief elected official of the unit of local government within which such closing or layoff is to occur." *See* 29 U.S.C. § 2102(a). The Act defines "employer" as "any business enterprise that employs" a requisite number of employees, and defines "unit of local government" as "any general purpose political subdivision of a State which has the power to levy taxes and spend funds, as well as general corporate and police powers." *See* 29 U.S.C. § 2101(a)(1) & (a)(7). The CHA notes that although the Act does not define "business enterprise," it does refer to a covered employer's business-related functions, such as a "plant closing"(§ 2101(a)), "sale of part or all of an employer's business" (§ 2101(b)), "seeking capital or business" (§ 2102(b)(1)), and "unforeseeable changes in price or cost" (§ 2102(c)(1)). Terming these "traditional business functions," the CHA argues that the WARN Act does not apply to government entities like the CHA because such entities do not engage in these functions, but, rather, they engage in "traditional government functions." The CHA also notes that because "unit of local government"

8

is defined in the Act, "Congress was well aware of the distinction between business enterprises and governmental entities" and argues that this further supports their argument that the WARN Act was not intended to apply to governmental entities. (Def.'s Mem. in Supp. at 5.) Although the parties agree that the WARN Act does not specifically include governmental entities in its definition of employer, this does not lead to the unescapable conclusion that the WARN Act does not apply to such entities. As the CHA notes, Congress has not only specifically extended coverage of certain statutes to include governmental entities, as in Fair Labor Standards Act, *see* 29 U.S.C. § 203,[9] but also has specifically excluded governmental entities, as seen in the National Labor Relations Act, *see* 29 U.S.C. § 152.[10]

The legislative history is likewise unhelpful regarding coverage of entities like the CHA. For instance, the House Conference Report states that the "Conferees intend that a 'business enterprise' be deemed synonymous with the terms company, firm or business, and that it consist of one or more sites of employment under common ownership or control." H.R. Rep. No. 100-156, at 1046 (1988), reprinted in 1988 U.S.C.A.A.N. 2078, 2079. This neither falls in favor of or against covering the CHA. The DOL, after noting that "the legislative history is not helpful on the specific question of coverage of public and quasi-public enterprises," determined that public and quasi-public entities could be subject to the Act (although "Federal, State, and local government public agencies and services" fall outside of coverage). Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042, 16044 (Apr. 20, 1989). While the CHA urges the

---

[9]This section defines "employer" as including "a public agency" and defines "public agency" as "the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States . . ., a State, or a political subdivision of a State; or any interstate governmental agency."

[10]This section defines "employer" as specifically "not includ[ing] the United States or any wholly owner Government corporation, or any Federal Reserve Bank, or any Sate or political subdivision thereof . . . ." *Id.*

9

court to reject the agency's construction of the statute under the principles announced in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, that case only directs the rejection of "administrative constructions [that] are contrary to clear congressional intent." 467 U.S. 837, 843 n.9 (1984). But this court cannot find that Congressional intent is clear regarding the definition of employer. As such, this court must defer to the DOL's interpretation "'so long as it is a permissible construction of the statute.'" *MBH Commodity Advisors, Inc. v. Commodity Futures Trading Comm'n*, ___ F.3d ___, 00-1957, 2001 WL 476908, at *7 (7th Cir. May 7, 2001) (quoting *Stinson v. United States*, 508 U.S. 36, 44 (1993)).[11] *See also City of Chicago v. FCC*, 199 F.3d 424, 428 (7th Cir. 2000) (courts may not "substitute [their] own construction of a statute when an agency has interpreted it in a reasonable fashion").

The DOL analyzes the statute as follows:

> In the preamble to the proposed regulations, DOL requested comments on whether agencies of State and local government which are independent and perform business activities should be covered. Several commentators opposed inclusion of these entities, arguing that the statutory definition of employer as a "business enterprise" is inapplicable to government agencies, that the tax payment test for notice to local governments is inapplicable to agencies of local government and that any definition would sweep too broadly and include school boards and similar entities. Other commentators supported inclusion as consistent with the intent of WARN to broadly protect workers against dislocation. Because of the use of the term "business enterprise," DOL concludes that regular Federal, State, and local government public agencies and services are outside the purview of WARN. . . . DOL agrees that the underlying intent of WARN is worker protection. Given the nature and the language of the law, DOL concludes that the

---

[11] The Seventh Circuit explained that "[t]he *Chevron* analysis is accomplished in two steps: first we must examine the text of the relevant statute to determine whether its plain meaning controls agency interpretation. If, on the other hand, the statute is ambiguous, the agency's interpretation governs if it is reasonable." *Id. See also Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). Moreover, when reviewing an agency's construction of a statute, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

10

> term "business enterprise" used in the statute includes public and quasi-public
> entities which engage in business (i.e., take part in a commercial or industrial
> enterprise; supply a service or good on a mercantile basis, or provide independent
> management of public assets, raising revenue and making desired investments).
> Whether a particular public or quasi-public entity is covered will be determined by
> the functional test described above and by an organizational test, i.e. whether the
> entity is managed by a separately organized governing body with independent
> authority to manage its personnel and assets. It should be noted that DOL has not
> defined covered public enterprises in terms of the traditional/non-traditional
> government functions distinction that was rejected by the Supreme Court as
> unworkable in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S.
> 528 (1984). The test that has been adopted is intended to be a relatively precise
> one that will include such entities as regional transportation authorities and
> independent municipal utilities, but will exclude such organizations as school
> boards.

54 Fed. Reg. at 16044. This construction of the WARN Act is entirely reasonable, and, therefore, this court will defer to the DOL's test for determining whether an entity like the CHA is covered by the Act.

**Is the CHA an employer under the WARN Act?**

Consistent with the analysis set forth above, the DOL issued a regulation defining "employer" as including

> public and quasi-public entities which engage in business (i.e., take part in a
> commercial or industrial enterprise, supply a service or good on a mercantile
> basis, or provide independent management of public assets, raising revenue and
> making desired investments), and which are separately organized from the regular
> government, which have their own governing bodies and which have independent
> authority to manage their personnel and assets.

20 C.F.R. § 639.3.[12] Plaintiffs do not argue that the CHA "take[s] part in a commercial or industrial enterprise" but contend that the CHA "provides independent management of public assets, rais[es] revenue and mak[es] desired investments." It can be reasonably argued that the

---

[12]The court notes that neither the parties nor the court could locate any relevant case law interpreting this regulation.

11

real estate is a public asset which is managed by the CHA Commissioners independent from the local governmental entity (the City of Chicago), it raises revenue (although the private revenues raised are a mere 20 percent of operating funds, most quasi-public entities--regional transportation authorities, for example--are subsidized by taxpayer funds), it is not apparent on this record that the CHA would make investments. Nevertheless, the court believes the CHA is readily described as taking part in a commercial enterprise. The enterprise is owning and managing rental real estate. Just as managing Carl Sandburg Village in Chicago, a private real estate development, is a commercial enterprise, CHA is a not-for-profit commercial real estate management enterprise, with a share of the rental market otherwise available to for-profit enterprises of a similar nature.

Neither is the court troubled by the temporary takeover of CHA by HUD. Once CHA resumed management of the property, it was more than 60 days until the layoff, and certainly at the time notice was given, CHA was in control of the enterprise. The DOL guidance describes quasi-public entities as those which are separately organized from the regular government (CHA is not a department of the City as are the Department of Planning and Department of Aviation), which have their own governing bodies (CHA has its own governing Commission and commissioners) and which have independent authority to manage their personnel and assets ("independent" here logically refers to independent from the local government–CHA is independent from the city in managing its assets). Unless coverage by WARN over quasi-public entities is to wax and wane based on the particular vagaries of unusual circumstance, the legal status of the CHA, must be the measure against which to determine quasi-public. Whatever leverage HUD had or has to impose its requirements on CHA does not change its legal status as a

quasi-public entity.

**Are different CHA locations considered a single site?**

The WARN Act requires 60 days notice only where there is a "plant closing" or "mass layoff." 29 U.S.C. § 2102(a). Both the WARN Act and the DOL regulations define "mass layoff" as a reduction in force that results in an employment loss at a single site of employment during any 30-day period for at least 33 percent the active employees where at least 50 employees are terminated or for at least 500 employees, regardless of whether there is at least a 33 percent reduction of force. See 29 U.S.C. § 2101(a)(3); 20 C.F.R. § 639.3(c). "Single site of employment" is not defined in the Act, but the DOL regulations set forth a number of factors to consider when determining whether separate sites may be deemed a "single site" under the Act. As pertinent here, the DOL regulations explain as follows:

> . . . Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.
> . . . Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of town and which are managed by a single employer are separate sites if they employ different workers.
> \* \* \* \*
> . . . For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.
> \* \* \* \*
> . . . The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The

13

application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(i). The evidence presented by the parties on this issue is sparse. Defendant offers one fact in support of its position, that the officers were generally stationed at one of the five facilities, and while plaintiffs do not appear to dispute this proposition, they assert that officers and equipment were transferred or shared between locations and supervisory staff oversaw more than one location at a given time. Although both the case law and guidance provided by the DOL support the CHA's argument that geographic location is of primary importance,[13] the disputed and meager record in this case is simply insufficient to determine whether a "single site" existed for WARN purposes. *See United Food & Commercial Workers Union Local No. 72 v. Giant Markets, Inc.*, 878 F. Supp. 700, 703 (M.D. Penn. 1995) ("Because it appears that it is the degree of interrelationship among the multiple workplaces in question that is germane to the 'single site of employment' issue and these facts are neither free from dispute nor fully developed, the pending [cross-summary judgment] motions will be denied . . . ."). *See also Dwyer v. Galen Hosp. Ill., Inc.*, No. 94 C 544, 1996 WL 111886 (N.D. Ill. Mar. 12, 1996) (concluding that fact issues regarding whether there existed a single site of employment precluded summary judgment).

---

[13]*See Viator v. Delchamps, Inc.*, 109 F.3d 1124, 1127 (5th Cir. 1997) ("[T]he DOL made clear in its analysis of its implementing regulations that '[t]he general rule is that separate facilities are separate sites.'") (first alteration added); *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996) ("Although no bright line test exists, the plain language of the statute and regulations makes clear that geographic proximity provides the touchstone in determining what constitutes a 'single site.'"); *Frymire v. Ampex Corp.*, 61 F.3d 757, 766 (10th Cir. 1995) ("Taken together, [the DOL] regulations suggest that proximity and contiguity are the most important criteria for making single site determinations."); Worker Adjustment and Retraining Notification, 54 Fed. Reg. at 16049 ("The regulations also recognize that, in some limited cases, geographically separate sites may still be considered a single site of employment because of an inextricable operational connection. DOL intends this exception to be a narrow one to cover those cases where separate buildings are used for the same purpose and share the same staff and equipment.").

14

**Is the CHA entitled to a reduction in damages?**

The CHA argues that any damages it may be found liable for must be reduced both by the application of a good faith defense and by certain wages and severance payments the CHA paid to plaintiffs. The WARN Act provides, as pertinent here, that an employer found liable must pay each aggrieved employee back pay for each day of violation and certain benefits under an employee benefit plan. *See* 29 U.S.C. § 2104(a)(1). The Act also provides that an employer's liability may be reduced by "any wages paid by the employer to the employee for the period of the violation" and "any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." *See* 29 U.S.C. § 2104(a)(2). Moreover,

> [i]f an employer which has violated [the Act] proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the Act] the court may, in its discretion, reduce the amount of liability or penalty provided for in this section.

29 U.S.C. § 2104(4).

This court believes that any exercise of its discretion regarding the good faith issue is better left to after all fact issues are resolved. With regard to severance and other payments and benefits made pursuant to agreements with plaintiffs' unions, courts have found that such payments are not voluntary and unconditional, are required by legal obligation, and, therefore, are not deductible from liability. *See, e.g., Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001) (severance payments not dedcutible); *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139 (3d Cir. 1998)

15

(severance payments made pursuant to an ERISA plan not deductible).[14] Again, the parties have not developed the record enough for the court to make a definitive statement on this point. The CHA notes that it made certain payments pursuant to agreements but failed to fully illuminate the court on the details of such agreements. As such, this court cannot determine whether such payments were voluntary and unconditional.

## CONCLUSION

For the above-stated reasons, the court denies the CHA's motion for summary judgment [#32].

Date: June 21, 2001          Enter: _____
                                    JOAN HUMPHREY LEFKOW
                                    United States District Judge

---

[14] In *Washington* v. *Aircap Indus., Inc.*, 860 F. Supp. 307, 313 n.4 (D.S.C. 1994), cited in support by the CHA, the court specifically noted that the plaintiffs did not challenge the "voluntary and unconditional" nature of severance payments made.

16